## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | Chapter 7 |
| | ) | |
| CARL P. AMARI, | ) | Bankruptcy Case No. 11-23399 |
| | ) | |
| Debtor. | ) | Honorable Jack B. Schmetterer |
| | ) | |
| MEDIA HOUSE PRODUCTIONS, INC. | ) | Adv No. 12 A 00979 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| CARL P. AMARI | ) | |
| | ) | |
| Defendant. | ) | |

### AMENDED ADVERSARY COMPLAINT

NOW COMES Plaintiff, MEDIA HOUSE PRODUCTIONS, INC., by its attorneys, FUKSA KHORSHID, LLC, and for its Amended Adversary Complaint to Determine Dischargeability pursuant to 11 U.S.C. §523, or in the alternative, to Revoke Debtor's Discharge pursuant to 11 U.S.C. §727(d)(1), against Defendant, CARL P. AMARI, , states as follows:

### THE PARTIES

1. The Plaintiff, Media House Productions, Inc. (hereafter, "MHP" or "Plaintiff") is an Illinois corporation in the business of digital/audio media production and editing owned by Jim McClain (hereafter, "Jim") and Don Sliter (hereafter, "Don").

2. The Defendant, Carl Amari (hereafter, "Amari" or "Defendant"), is the debtor in this case and filed his petition in bankruptcy ("Petition") under chapter 7 of the Bankruptcy Code on June 1, 2011 ("Petition Date").

3. Amari was granted an order of discharge under section 727 on March 2, 2012.

## JURISDICTION

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1334.

5. Venue is appropriate in the Northern District of Illinois pursuant to 28 U.S.C. §1409(a).

6. This matter is being brought as an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7001(1) and 523(a)(3)(B) to determine dischargeability under 523(a)(2), 523(a)(4) and 523(a)(6), or in the alternative, to revoke the debtor's discharge pursuant to Section 727 (d)(1) and 727 (d)(2), of the Bankruptcy Code, 11 U.S.C.

7. This is a core proceeding pursuant to 28 U.S.C §157(b)(2)(I).

## GENERAL ALLEGATIONS

8. Prior to the Petition Date, Amari was the manager and member of Falcon Picture Group, LLC (hereafter, "FPG"), an Illinois limited liability company.

9. According to the Petition, Amari owned a seventy-five (75%) interest in FPG.

10. FPG is self-described as a producer, developer and distributor of audio, video, and DVD consumer products for sale through retail, mail order, and direct marketing channels of distribution.

11. In approximately October, 2009, FPG began the creation and production of an audio book based on certain books of the Catholic New Testament of the Bible, later dubbed, the "Truth & Life Dramatized Audio Bible" (hereafter, the "Audio Bible").

12. At that time, Amari contacted Plaintiff to request its services to help produce the Audio Bible.

13. Therefore, Amari and Plaintiff soon began discussing the terms of an investment in which Plaintiff would contribute cash and services in exchange for a share of the revenue generated by the Audio Bible.

14. In order to induce Plaintiff to enter into the investment, Amari showed Plaintiff a document titled "The Catholic New Testament Audio Bible Investor Information" (the "Investor Document") that included a description of the Audio Bible project as well as a budget for the Audio Bible project itemizing costs and expenses to reflect the need for $2,000,000.00. A copy of the Investor Document is attached hereto as **Exhibit A**.

15. Amari represented to Plaintiff that he would be personally contributing $1,000,000.00 in cash to FPG to cover half of the required budget (hereafter, the "Cash Misrepresentation"), as reflected in the Investor Document where it is written that "Falcon Picture Group is investing $1mm, for 50% of the profit or approximately $4.61 per unit sold". *See* Exhibit A.

16. In addition, just before Plaintiff agreed to invest in the Audio Bible project, Amari made the following verbal representations to Plaintiff (hereafter, the "Group Misrepresentations"):

    a) that he was able to cover the entire budget for the Audio Bible project on his own, but was considering a "partner" to invest in the Audio Bible project;

    b) that a similar Protestant audio bible project Amari produced, called the "Word of Promise", grossed over $20 million in sales by the end of 2009 and was therefore generating millions of dollars for him, personally, and that the Audio Bible would be an even bigger opportunity;

c) that he was producing numerous television, radio, and feature film products that had made him, or was going to make him, a lot of money.

17. Persuaded by Amari's Cash Misrepresentations, the Group Misrepresentations, and the Investor Document, in approximately March, 2010, Amari and Plaintiff entered into a verbal agreement whereby Plaintiff would contribute cash in the amount of $125,000.00, and services with a value of approximately $375,000.00, in exchange for 25% of the net sales revenue generated by the sales of the Audio Bible (the "Payments"); a third-party individual named Michael Stark ("Stark") was investing $500,000.00 in cash in exchange for 25% of the net sales revenue generated by the sales of the Audio Bible; and FPG would contribute $1,000,000.00 in cash in exchange for 50% of the net sales revenue generated by the sales of the Audio Bible.

18. About this time, for reasons yet unknown, Amari told Jim not to disclose to Stark that part of Plaintiff's contribution would be in the form of services.

19. A written agreement, based upon the main terms of the above-referenced verbal agreement, was finally executed in July, 2010 (the "Agreement"). A copy of the Agreement is attached hereto as **Exhibit B**.

20. The Agreement provided that FPG, of which Amari was the sole manager and member, would contribute the $1,000,000.00 in cash towards the Audio Bible project. The Agreement also provided that FPG would provide sales and royalty statements and make payments to Plaintiff within ten days from receipt thereof and Plaintiff would have the right to inspect the books and records of FPG during the term of the Agreement.

21. Plaintiff performed all of its obligations under the Agreement by contributing a total of $125,000.00 in cash and completing $375,000.00 in voice-over recording, audio editing, and audio mixing services by August, 2010.

22. Plaintiff is unaware of whether Stark contributed $500,000.00 in the form of cash.

23. The Audio Bible was completed and became available for purchase to the general public in approximately November of 2010.

24. In the next couple of months, Plaintiff became concerned after only receiving approximately $58,104.00[1] from FPG, and after not receiving any royalty statements or other information related to the sales of the Audio Bible that it was entitled to receive pursuant to the Agreement.

25. As a result, Plaintiff began demanding the royalty statements, quarterly reports, digitally tracked sales, and additional information related to the investment (the "Reports") from Amari, but Amari failed to produce the requested Reports.

26. In approximately May of 2011, Plaintiff met with Amari to discuss the status of the missing Reports. During this meeting, Amari admitted that neither he, nor FPG, ever contributed $1,000,000.00 in cash towards the Audio Bible because he claimed that he provided services and incurred costs valued over $1,000,000.00.

27. Shortly thereafter, on June 1, 2011, Amari filed for bankruptcy protection but never mentioned to Plaintiff that he did so.  Plaintiff was not aware of the Petition at that time.

---

[1] Upon information and belief, a portion of this amount also included reimbursement of expenses incurred by Plaintiff.

28. Instead, in June 2011, Plaintiff began discussions with Amari about a return of its investment in exchange for its interest in the Audio Bible; however, these negotiations quickly broke down.

29. However, in order to assuage Plaintiff's continuing concerns, Amari and Stark met with Plaintiff on September 8, 2011. During that meeting, Amari finally agreed to provide the Reports but stressed the dire need for additional marketing services due to the fact that the holiday season was approaching and the Audio Bible would be in high demand.

30. Plaintiff, concerned about losing sales during the "peak season" agreed to contribute an additional $25,000.00 in marketing services because Amari promised Plaintiff that that contribution would be repaid to Plaintiff before any other payments were made. To date, Amari has not repaid the $25,000.00 to Plaintiff (hereafter, the "Repayment Misrepresentation").

31. Merely four days after this meeting, September 12, 2011, the last day to object to the dischargeability of Amari's debts under his Petition came, yet Plaintiff was completely unaware of the fact that Amari filed for bankruptcy.

32. On November 22, 2011, Plaintiff, Amari, and Stark met again because Amari had failed to provide any of the Reports for the Audio Bible Project. In addition, after learning that many other parties that provided services for the Audio Bible project had not been paid, Plaintiff demanded to know where the money that was invested and generated by the Audio Bible project was going.

33. During that meeting, Amari admitted to "borrowing" over $50,000.00 from commissions and royalties from sales of the Audio Bible product but assured Plaintiff

that those sums would be reimbursed. To date, Amari has failed to reimburse the aforementioned sums (hereafter, the "Borrowing Fraud").

34. As a last ditch effort to keep Plaintiff at bay, in the beginning of December 2011, Amari proposed that the Audio Bible be placed into a limited liability company, to be named "Truth & Life Bible, LLC" or some derivation thereof, in which Amari, Stark, Jim, and Don would be members to ensure a fresh start to their future collaboration (hereafter, the "LLC Fraud").

35. Jim and Don began working on the formation of the limited liability company less than two weeks later, but quickly learned that a limited liability company named, "Truth & Life Bible LLC" (hereafter, the "LLC") had already been formed on November 26, 2011 and its only members were Amari and Stark! A copy of the "LLC File Detail Report" is attached hereto as **Exhibit C**.

36. When confronted with this discovery, Amari sent a dishonest email claiming that it was agreed that Amari's accountant (Rajiv) would form the LLC and that "I [Amari] don't know what names are on the LLC but it is not going to be finalized until all of us, including Don is satisfied." A copy of this email is attached hereto as **Exhibit D**.

37. The email also evidenced that Amari was going to (and ultimately did) purchase FPG's "share" in the Audio Bible.

38. Amari then refused to add Don and Jim as members of the LLC and continued to refuse to provide the Reports to Plaintiff.

39. Shortly thereafter, during the last week of December 2011, Plaintiff learned that Amari had filed for bankruptcy protection.

40. As a result, Plaintiff became even more determined to obtain the Reports and finally, on April 2, 2012, just a month after the entry of the order granting Amari a discharge, Amari, through his counsel, turned over some financial records to Plaintiff's counsel. A copy of the email evidencing the turn-over of these financial records is attached hereto as **Exhibit E.**

41. Part of these financial records revealed that, according to FPG's own income statement, from November 1, 2010 to December 31, 2011, the Audio Bible (now being referred to as the Truth & Life Bible LLC) netted $414, 219.66[2]. Attached hereto as **Exhibit F** is a copy of the income statement.

42. Accordingly, FPG was obligated to pay Plaintiff approximately $103,554.91 pursuant to the Agreement, but this payment was never received (hereafter, the "Distribution Fraud").

43. FPG calculated distributions to the "partners" of the Audio Bible on its balance sheet, and while it calculated Amari's distribution ($313,011.03) based on approximately seventy-five (75%) of the net revenue, as it should have, Plaintiff's distribution ($58,104.41) as reflected on the balance sheet is based on approximately fourteen percent (14%) of the net revenue. A copy of the balance sheet is attached hereto as **Exhibit G**[3]**.**

44. Curiously, in an email dated July 12, 2012 (approximately one month after Plaintiff filed its original Adversary Complaint), Rajiv sent an email to Jim and Don that included updated and revised financial statements for the Audio Bible. One of the

---

[2] Plaintiff, however, does not accept the income statement as being accurate for the reasons further pled, but utilizes the statement to demonstrate that Plaintiff was not compensated even based on this statement. Also, as sometimes seen in the financial documents, Plaintiff was referred to as "B-Media".

[3] As seen in the financial documents including the balance sheet, Jim was given 2% of the distributions at some point due to his contributions to the Audio Bible.

statements was an allocation of profit among the partners "as it should have been and as it actually happened". Attached as **Exhibit H** is a copy of the "Revised Allocation".

45. Exhibit H demonstrates that, according to Rajiv's calculations, Amari took an over-distribution of $103,152.80 (hereafter, the "Over-Distribution").

46. Rajiv's email also included a document titled "Notes to the Financial Statements" that described that during the period of January 1, 2012 to April 30, 2012, the Audio Bible grossed $37,207.75 in revenue, that there was cash in the amount of $9,911.82 in the account as of April 30, 2012, and that Stark and Amari received distributions of $10,000 and $6,000, respectively (hereafter, the "2012 Distribution"). A copy of the "Notes" is attached hereto as **Exhibit I**.

47. The email contained additional financial documents including a revised income statement, a revised balance sheet, and a statement of production costs attached hereto as **Exhibit J**, **Exhibit K**, and **Exhibit L**, respectively.

48. Exhibit L included a description of costs for "Falcon Salaries" in the amount of $629,000.00 which included salaries to Amari and his wife even though these costs were never budgeted for or otherwise agreed upon by Plaintiff (hereafter, the "Salary Fraud").

49. As a result of being omitted from the Petition, Plaintiff never received any notice regarding a deadline for the filing of a proof of claim or a determination of dischargeability, or learned of the time in which to do so.

50. As mentioned above, Plaintiff did not learn on the Petition until late December 2011, well after the last date to file an objection to dischargeability.

51. Furthermore, while Plaintiff was suspicious of Amari's actions throughout the time that Plaintiff was working with Amari, Plaintiff's suspicions were not confirmed until it obtained certain financial documents from Amari's counsel on April 2, 2012.

## **CLAIMS FOR RELIEF**

**COUNT I - Objection to Dischargeability (11 U.S.C. § 523(a)(2)(A))**

52. Plaintiff repeats and realleges paragraphs 1-51 as if fully set forth herein.

53. Pursuant to 11 U.S.C. § 523(a)(3)(B), Plaintiff should be permitted to object to dischargeability of debts of the kind specified in paragraphs (2), (4), or (6) of subsection 523(a).

A. The Cash Misrepresentation, the Group Misrepresentations, and the Investor Document.

54. The Cash Misrepresentation, the Group Misrepresentations, and the Investor Document were false representations made to Plaintiff with the intent to obtain cash and services under false pretenses due to the fact that at the time of making the Cash Misrepresentation and Group Misrepresentations and tendering the Investor Document, Amari knew that he was not going to contribute $1,000,000.00 in cash to the Audio Bible project because he did not have that amount of money at that time and was otherwise unable to obtain that amount of money.

55. Plaintiff justifiably relied on the Cash Misrepresentation, the Group Misrepresentations, and the Investor Document, as to the amounts required to finance the Audio Bible project, as to the fact that a product similar to the Audio Bible allegedly grossed over $20 million in sales, as to the fact that Amari was a very successful entrepreneur, and as to the fact that Amari would be contributing half of the budgeted

amount in cash. Plaintiff would not have entered into the Agreement had it known that these things were not true, especially that Amari was not going to contribute $1,000,000.00, because Plaintiff would have known that half of the budget for the Audio Bible would be missing.

    56. As a result of Amari's Cash Misrepresentation, Group Misrepresentations, and Investor Document, Plaintiff expended $125,000.00 in cash and provided $375,000.00 in services as required by the Agreement.

    57. Said money and services were obtained by Amari through false representations and under false pretenses, such that the debt should be declared nondischargeable under 11 U.S.C. §523(a)(2)(A).

B. The Repayment Misrepresentation.

    58. The Repayment Misrepresentation was a false representation made to Plaintiff with the intent to obtain services under false pretenses due to the fact that at the time of making the Repayment Misrepresentation, Amari knew that he was not going to repay Plaintiff the $25,000.00 worth of services it performed because Amari just wanted the marketing services during the holiday season so that he can profit form increased sales without regard to anything that Plaintiff was entitled to.

    59. Plaintiff justifiably relied on the Repayment Misrepresentation because Amari convinced Plaintiff that a lot of sales would be lost if Plaintiff did not perform the marketing services before the holiday season and that because so much money would be made from these sales, Plaintiff's additional contribution of services would be easily repaid.

60. As a result of Amari's Repayment Misrepresentation, Plaintiff performed expended $25,000.00 in additional services.

61. Said services were obtained by Amari through false representations and under false pretenses, such that the debt should be declared nondischargeable under 11 U.S.C. §523(a)(2)(A).

C. The "Borrowing" Fraud.

62. The "Borrowing" Fraud was an actual fraud committed by Amari.

63. Amari knew that he was not entitled to certain commissions and royalties that were to be paid to third parties such as salespeople and actors, but nevertheless, intentionally took the money for himself and never reimbursed the Audio Bible project or paid the third parties.

64. As a result of Amari "borrowing" over $50,000.00 from the Audio Bible project and not reimbursing said sum, Plaintiff was damaged in that other income that would normally have been distributed to Plaintiff, was instead used to make up for the unpaid commissions and royalties.

65. Said money was obtained through Amari's fraud, such that the debt should be declared nondischargeable under 11 U.S.C. §523(a)(2)(A).

D. The Distribution Fraud, the Over-Distribution, and the 2012 Distribution.

66. The Distribution Fraud, the Over-Distribution, and the 2012 Distribution were additional examples of actual fraud committed by Amari.

67. Amari was in full and sole control of the money that the Audio Bible was generating.

68. Amari knew that Plaintiff was entitled to 25% of the net revenue generated by the sales of the Audio Bible and intentionally withheld these distributions from Plaintiff and misappropriated them for his own benefit such that, even by his own accountant's admission, Amari collected more than $100,000.00 that did not belong to him.

69. As a result of Amari's fraud, Plaintiff suffered losses in excess of $50,000.00 and continues to suffer losses as evidenced by the 2012 Distributions, which again, Amari knew were due to Plaintiff but intentionally kept for his own benefit.

70. Although the exact amounts are not yet known, the distributions Amari kept for himself that did not belong to him were obtained through Amari's fraud, such that the debt should be declared nondischargeable under 11 U.S.C. §523(a)(2)(A).

E. The Salary Fraud.

71. Another manner in which Amari committed an actual fraud committed was by paying himself, his wife, and other friends and relatives salaries even though these individuals did not perform any work for the Audio Bible and even though these salaries were never budgeted for as reflected in the Investor Document or agreed upon by Plaintiff.

72. Amari knew that the salaries were not reflected in the budget and were not the type of expenses that would be used to determine the net revenue form which distributions to Plaintiff would be calculated.

73. Nevertheless, Amari misappropriated over $600,000.00 generated by the sales of the Audio Bible for his own benefit and for the benefit of his wife and friends.

74. As a result, Plaintiff was damaged in that Amari looted money that should have gone to pay actual costs, expenses, and distributions to Plaintiff and therefore reduced the total amount of distributions that should have been paid to Plaintiff.

75. The distributions were made as a result of Amari's fraud such that the debt should be declared nondischargeable under 11 U.S.C. §523(a)(2)(A).

76. Based on the allegations of false representations, false pretenses, and actual fraud, in parts A though E of this Count I, it is necessary for this Court to impose a constructive trust on the Audio Bible project. The Audio Bible project is still a viable and valuable asset that can, and does, continue to generate revenue through various sales channels and it must be preserved and supervised so that it is fully exploited, and so that the revenues generated from the sales of the Audio Bible products are distributed to the parties, including Plaintiff, that are entitled to receive such proceeds.

WHEREFORE, for the foregoing reasons, pursuant to 11 U.S.C. §523(a)(2)(A), Plaintiff prays that the Court:

A) determine that the debt owed by Defendants to Plaintiff pursuant to the Agreement as set forth herein is nondischargeable;

B) enter a judgment in favor of Plaintiff for all amounts due under the Agreement and for punitive damages subject to proof, award Plaintiff its attorneys' fees and costs for this matter;

C) order Amari to provide Plaintiff with an accounting relating to the contributions to the Audio Bible;

D) impose a constructive trust on the Audio Bible project;

E) and grant such other relief as the Court deems just and reasonable.

**COUNT II - Objection to Dischargeability (11 U.S.C. § 523(a)(4))**

77. Plaintiff repeats and realleges paragraphs 1-76 as if fully set forth herein.

78. The "Borrowing" Fraud, the Distribution Fraud/Over-Distribution, the 2012 Distributions, and the Salary Fraud (collectively, the "Embezzled Funds") all constituted the fraudulent appropriation of property, money, by a person, Amari, into whose hands it has lawfully come.

79. Amari appropriated the Embezzled Funds for his own benefit because he used the Embezzled Funds to pay himself, to pay his debts and expenses, or to purchase items for himself.

80. Amari appropriated the Embezzled Funds with fraudulent intent because he knew that the Embezzled Funds were not his and even told Plaintiff that he would return a portion of the Embezzled Funds. Amari's appropriation of the Embezzled Funds was not done by mistake.

81. The Embezzled Funds, or at least a portion thereof (the exact amount to be determined), were the property of Plaintiff. The "Borrowing" Fraud included money that would have increased the amount of the distributions to Plaintiff. The Distribution Fraud/Over-Distribution included distributions that should have been paid to Plaintiff as admitted by Amari's accountant. The 2012 Distribution included distributions only to Amari and Stark even though Plaintiff was also entitled to these distributions. The Salary Fraud involved the appropriation of money that would have otherwise increased the distribution to Plaintiff.

82. The Embezzled Funds were in fact embezzled by Amari such that the debt should be declared nondischargeable under 11 U.S.C. §523(a)(4).

WHEREFORE, for the foregoing reasons, pursuant to 11 U.S.C. §523(a)(4), Plaintiff prays that the Court:

A) determine that the debt owed by Defendants to Plaintiff pursuant to the Agreement as set forth herein is nondischargeable;

B) enter a judgment in favor of Plaintiff for all amounts due under the Agreement and for punitive damages subject to proof, award Plaintiff its attorneys' fees and costs for this matter;

C) order Amari to provide Plaintiff with an accounting relating to the contributions to the Audio Bible;

D) impose a constructive trust on the Audio Bible project;

E) and grant such other relief as the Court deems just and reasonable.

### COUNT III - Objection to Dischargeability (11 U.S.C. § 523(a)(6))

83. Plaintiff restates and realleges paragraphs 1-82 as if fully set forth herein.

84. Amari's actions, such as i) failing to contribute the $1,0000,000.00 to the Audio Bible project, ii) committing the "Borrowing" Fraud, iii) committing the Distribution Fraud, Over-Distribution, and 2012 Distributions, and iv) committing the Salary Fraud, were done willfully and maliciously.

85. Amari's failure to contribute $1,000,000.00 towards the Audio Bible budget pursuant to the Agreement was willful in that Amari knew that he was not going to be able to contribute the money and, in fact, did not contribute the money. Amari also knew that his failure to contribute the money would affect the profitability of the Audio Bible and cause Plaintiff substantial injury but consciously disregarded this outcome. This was done without just cause or excuse.

86. Amari's acts in committing the "Borrowing" Fraud were willful because he knew that the money he appropriated did not belong to him but took it anyway, and he knew that he would not repay the money at the time that he took it. Amari used the money to pay for personal expenses and debts. Amari also knew that by committing the "Borrowing" Fraud, Plaintiff would be damaged because its distributions would be reduced but consciously disregarded this outcome. This was done without just cause or excuse.

87. Amari's acts in committing the Distribution Fraud, Over-Distribution, and 2012 Distributions were willful because he intentionally failed to distribute money that belonged to Plaintiff and kept it for himself. Amari knew that he was going to use this money to pay certain debts that he owed. Amari knew that by looting money from the Audio Bible proceeds, Plaintiff would be damaged because its distributions would be reduced but consciously disregarded this outcome. This was done without just cause or excuse.

88. Amari caused the salaries to be paid to himself and others knowing that there was no agreement with Plaintiff or Stark that allowed for these payments. Therefore, there was no just cause or excuse to pay the salaries. Amari also knew that by paying the salaries, Plaintiff would be damaged because its distributions would be reduced but consciously disregarded this outcome.

89. Amari's actions caused damage to the Plaintiff becasue Plaintiff devoted all of its time, resources, and efforts towards the Audio Bible but received little, if anything in return, and as a result, fell into debt, laid off employees, and eventually ceased operating its business altogether.

WHEREFORE, for the foregoing reasons, pursuant to 11 U.S.C. §523(a)(6), Plaintiff prays that the Court:

A) determine that the debt owed by Defendants to Plaintiff pursuant to the Agreement as set forth herein is nondischargeable;

B) enter a judgment in favor of Plaintiff for all amounts due under the Agreement and for punitive damages subject to proof, award Plaintiff its attorneys' fees and costs for this matter;

C) order Amari to provide Plaintiff with an accounting relating to the contributions to the Audio Bible;

D) impose a constructive trust on the Audio Bible project;

E) and grant such other relief as the Court deems just and reasonable.

## COUNT IV (in the alternative) –
## Revocation of Discharge (11 U.S.C. § 727(d))

90. Plaintiff restates and realleges paragraphs 1-89 as if fully set forth herein.

91. Amari obtained the order granting his discharge through the frauds described herein.

92. Plaintiff did not learn of the frauds until it received some of the financial documents relating to the Audio Bible on April 2, 2012, after the order of discharge.

93. Furthermore, the Petition reflects that:

    a) Amari concealed the Audio Bible asset and did not reference it by name or title under Schedules B or C;

    b) Amari concealed the Audio Bible asset by transferring it to the Truth & Life Bible, LLC, formed on November 26, 2011, which, as reflected by

the Notes and other financial statements, generated revenue from the date of its formation and throughout the pendency of the Petition;

c) Amari did not list Plaintiff under Schedules E or F;

d) Amari did not list the Agreement referenced as Exhibit A herein in Schedule G;

e) Amari did not list Plaintiff as creditor with FPG as co-debtor under Schedule H;

f) Amari, upon information and belief, did not include income from the Audio Bible in Schedule I; and,

g) Amari failed to include income from the Audio Bible and failed to account for Plaintiff as creditor in its Statement of Financial Affairs.

93. By committing the LLC Fraud, Amari became entitled to property that would properly be property of the bankruptcy estate and knowingly failed to report the acquisition of the property or deliver it to the trustee.

94. Amari engaged and continues to engage in fraud upon this Court and his estate by concealing and transferring assets, disclaiming certain income, and failing to disclose the assets owned by the incorporated or unincorporated businesses in which Amari has an interest.

95. Because Amari obtained his discharge through fraud, this Court should revoke Amari's discharge pursuant to 11 U.S.C. §727(d)(1).

96. Because Amari transferred the Audio Bible to the LLC and never disclosed this to this Court, and because the LLC has been generating money for Amari, this Court should revoking Amari's discharge pursuant to 11 U.S.C. §727(d)(2).

WHEREFORE, for the foregoing reasons, Plaintiff prays that this Court enter an Order revoking Amari's discharge pursuant to 11 U.S.C. §727(d)(1) and 11 U.S.C. §727(d)(2), and for such other relief as this Court deems equitable and just.

                                              Respectfully submitted,
                                              Media House Productions, Inc.

                                              By:   /s/Lucas M. Fuksa
                                                    Its Attorney

Lucas M. Fuksa
FUKSA KHORSHID, LLC
70 W. Erie St., 2nd Floor
Chicago, IL 60654
T: 312-266-2221
F: 312-266-2224